UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SELASSIE EDWARDS, individually and on behalf of all others similarly situated,<br><br>　　　　　　　　　　　Plaintiff,<br>　v.<br>THE QUAKER OATS CO.,<br>　　　　　　　　　　　Defendant. | Case No.: 1:25-cv-6794<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Selassie Edwards ("Plaintiff") brings this action on behalf of himself and all others similarly situated against Defendant The Quaker Oats Co. ("Defendant" or "Quaker"). Plaintiff makes the following allegations pursuant to the investigation of his counsel and based upon information and belief, except as to the allegations specifically pertaining to himself, which are based on his personal knowledge.

## NATURE OF THE ACTION

1. This is a class action on behalf of purchasers of Defendant's Life Cereal products (the "Products")[1] that claim to have "No Artificial Preservatives." This representation is false and/or misleading because the Products contain tocopherols—well-known artificial preservatives commonly used in food products.

2. Defendant's "No Artificial Preservatives" representation is featured on the Products' labeling in order to induce health-conscious consumers to purchase foods that are free from artificial preservatives. Defendant markets its Products in a systematically misleading manner by misrepresenting that the Products do not contain artificial preservatives.

3. Defendant has profited unjustly as a result of its deceptive conduct. Plaintiff

---

[1] The Products include all of Defendant's products that are advertised as containing "No Artificial Preservatives" but contain tocopherols.

therefore asserts claims on behalf of himself and similarly situated purchasers for violation of New York General Business Law §§ 349 and 350, breach of express warranty, and unjust enrichment.

## JURISDICTION AND VENUE

4.  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(a) because this case is a class action where the aggregate claims of all members of the proposed class are in excess of $5,000,000.00 exclusive of interest and costs, there are over 100 members of the putative class, and at least one class member is a citizen of a state different than Defendant.

5.  This Court has personal jurisdiction over Defendant because a substantial portion of the events that gave rise to Plaintiff's claims occurred in New York.

6.  Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial portion of the events that gave rise to Plaintiff's claims occurred in this District.

## PARTIES

7.  Plaintiff Selassie Edwards is a citizen of New York who resides in Bronx, New York. Mr. Edwards has purchased the Products on multiple occasions. On one occasion, Plaintiff purchased Cinnamon Life Multigrain Cereal and Original Life Multigrain Cereal Product from a Western Beef Supermarket located in the Bronx in or around December 2024. In purchasing the Product, Mr. Edwards relied on Defendant's false, misleading, and deceptive marketing of the Product containing "No Artificial Preservatives." Mr. Edwards understood that "No Artificial Preservatives" meant the Product did not contain any artificial preservatives. However, the Product he purchased contained the artificial preservative tocopherols. Had Mr. Edwards known the "No Artificial Preservatives" representation was false and misleading, he

would not have purchased the Product, or, at the very least, would have only been willing to purchase the Product at a lesser price.

8.      Defendant The Quaker Oats Co. is a corporation organized under the laws of Delaware with its principal place of business located at 555 West Monroe Street, Chicago, Illinois 60661.  Defendant imports, distributes, advertises, manufactures, and/or sells the Products throughout New York and the United States.

**GENERAL ALLEGATIONS**

9.      **Defendant misrepresents that the Products contain "No Artificial Preservatives."**  Defendant advertises on the label of the Products that they contain "No Artificial Preservatives."  Thus, reasonable consumers are led to believe the Products are free from artificial preservatives.  However, the Products contain tocopherols, which are well-known artificial preservatives.  Examples of the Products' labeling, along with their ingredient list, are depicted on the following page.

///

///

///

///

///

///

///

///

///

///

///





10. **Tocopherols are an artificial chemical preservative.** Tocopherols are an artificial chemical preservative as the term is defined by the FDA in 21 C.F.R. §101.22(a)(5): "The term *chemical preservative* means any chemical that, when added to food, tends to prevent or retard deterioration thereof, but does not include common salt, sugars, vinegars, spices, or oils extracted from spices, substances added to food by direct exposure thereof to wood smoke, or chemicals applied for their insecticidal or herbicidal properties."

11. Tocopherols are specifically listed on the FDA's regulatory listing of chemical preservatives. 21 C.F.R. Part 182 Subpart D, § 182.3890.

12. Two forms of tocopherols are "generally recognized as safe." *See id.* § 182.3890(b) ("This substance is generally recognized as safe [GRAS] when used in accordance with good manufacturing practice.").

13. Per 21 C.F.R. §184.1890(a), "[t]he α-tocopherols that are the subject of this GRAS affirmation regulation are limited to the following:"

> (1) *d*-α-Tocopherol ... [which] is the chemical [2R,4′R,8′R]-2,5,7,8-tetramethyl-2-(4′,8′,12′-trimethyl-tridecyl)-6-chromanol. It occurs commercially as a concentrate and is a red, nearly odorless, viscous oil. It is obtained by vacuum steam distillation of edible vegetable oil products.
>
> (2) *dl*-α-Tocopherol ... [which] is a mixture of stereoisomers of 2,5,7,8-tetramethyl-2-(4′,8′,12′-trimethyl-tridecyl)-6-chromanol. It is chemically synthesized by condensing racemic isophytol with trimethyl hydroquinone. It is a pale yellow viscous oil at room temperature.

14. Both *d*-α Tocopherols and *dl*-α-Tocopherols (together, "α-Tocopherols") are chemical preservatives. *See* 21 C.F.R. Part 182 Subpart D, § 182.3890; 21 C.F.R. Part 184 Subpart B, § 184.1890; 21 C.F.R. §101.22(a)(5).

15. Food preservatives are classified into two main groups: antioxidants and

6

antimicrobials. Food scientists agree that the chemical properties of tocopherols make it a preservative. Specifically, tocopherols are antioxidants.[2] "Antioxidants, natural or synthetic food preservatives, are additives that preserve food from 'farm to plate' and militate against oxidative deterioration on storage and processing."[3]

16. The FDA recognizes that preservatives, like tocopherols, are commonly used in packaged foods such as the Products. The FDA states that preservatives help "prevent food spoilage from bacteria, molds, fungi or yeast (antimicrobials); slow or prevent changes in color, flavor, or texture and delay rancidity (antioxidants); [and] maintain freshness."[4] And in its "Types of Food Ingredients," the FDA lists tocopherols as a preservative that is used in cereals.[5]

17. Defendant admits on the labels of its Product that tocopherols are used "to preserve freshness[.]"

18. **The Products' tocopherols are commercially produced and/or chemically processed.** Tocopherols are naturally occurring in certain instances. That is not true of the tocopherols contained in the Products. The tocopherols contained in the Products are commercially manufactured and the result of extensive chemical processing.

19. Both *d*-α and *dl*-α-Tocopherols are synthetically and commercially produced.

---

[2] E N Frankel, *The antioxidant and nutritional effects of tocopherols, ascorbic acid and beta-carotene in relation to processing of edible oils*, Abstract, 43 BIBL NUTR DIETA (1989) ("Tocopherols belong to a class of ... antioxidants"), abstract available at https://pubmed.ncbi.nlm.nih.gov/2658965/.

[3] Douglas W. Wilson et al., *The Role of Food Antioxidants, Benefits of Functional Foods, and Influence of Feeding Habits on the Health of the Older Person: An Overview*, 6 ANTIOXIDANTS (2017), at 2, available at https://pmc.ncbi.nlm.nih.gov/articles/PMC5745491/.

[4] *Overview of Food Ingredients, Additives, and Colors*, U.S. FOOD & DRUG ADMIN. (2018), https://www.fda.gov/files/food/published/Food-Ingredients-and-Colors-%28PDF%29.pdf.

[5] U.S. FOOD & DRUG ADMIN., *Types of Food Ingredients*, https://www.fda.gov/food/food-additives-and-gras-ingredients-information-consumers/types-food-ingredients ("Examples of [u]ses ... cereals[.]") (current as of July 6, 2023).

Per 21 C.F.R. § 184.1890, these α-tocopherols are "obtained by vacuum steam distillation of edible vegetable oil products[,]" *id.* § 184.1890(a)(1), or, "chemically synthesized by condensing racemic isophytol with trimethyl hydroquinone[,]" *id.* § 184.1890(a)(2).

20. Vacuum steam distillation of edible vegetable oil products is an artificial and commercial process, and is not natural. Vacuum-steam distillation, or, "stripping," is "an integral part of physical refining ..." of crude vegetable oil.[6]

21. According to the European Food Safety Authority:

> Tocopherol-rich extract is manufactured by the vacuum steam distillation of edible vegetable oil products.
>
> The most important commercial source of tocopherols comes from the processing of vegetable oils. The deodorising step in the oil processing involves distillation to remove free fatty acids, and the tocopherols are co-distilled with the fatty acids into the fatty acid distillate. **A number of methods may then be used to extract the tocopherols from the distillate.** These include esterification, saponification, distillation, chromatographic methods, liquid–liquid extraction, crystallisation, enzymatic methods and supercritical fluid extraction. **These are used in various combinations, as alone, no method is sufficient.** The first step is the removal of fatty components, which make up the major part of the distillate. This is usually achieved using esterification and saponification, followed by distillation. Non-saponifiable components can then be removed using chromatographic methods, crystallization and molecular distillation. Individual components such as α-, γ- and δ-tocopherols can be isolated using chromatographic separation.[7]

22. Second, "chemical[] synthes[is] by condensing racemic isophytol with trimethyl

---

[6] Sabah Mounir et al., *Evaporation in the edible oil industry*, EVAPORATION TECHNOLOGY IN FOOD PROCESSING (ed. Seid Mahdi Jafari et al.) (2024), 209-246, at 218, available at https://www.researchgate.net/publication/379005458_Vapor_recompression_systems_for_food_processing_evaporators.

[7] EFSA PANEL ON FOOD ADDITIVES AND NUTRIENT SOURCES ADDED TO FOOD, *Scientific Opinion on the re-evaluation of tocopherol-rich extract (E 306), α-tocopherol (E 307), γ-tocopherol (E 308) and δ-tocopherol (E 309) as food additives*, EFSA JOURNAL 13(9) (2015), at 19 https://efsa.onlinelibrary.wiley.com/doi/epdf/10.2903/j.efsa.2015.4247 (internal citations omitted) (emphasis added).

8

hydroquinone," 21 C.F.R. §184.1890, is an artificial and commercial process, and is not natural.

23. **The subjective intent of use is immaterial.** Tocopherols function as an artificial preservative in the Products, and this is true regardless of Defendant's subjective purpose or intent for adding it to the Products, such as for vitamin or health-related reasons.[8]

24. Even if the Products' tocopherols do not function as artificial preservatives in the Products, they nonetheless qualify as artificial preservatives given that they have the capacity or tendency to do so. *See* 21 C.F.R. §101.22(a)(5) (defining "chemical preservative" as "any chemical that, when added to food, tends to prevent or retard deterioration"); *see also id.* § (c) ("A statement of *artificial* flavoring, *artificial* coloring, or *chemical* preservative shall be placed on the food or on its container or wrapper") (emphasis added); Merriam-Webster's Dictionary (defining "preservative" as "something that preserves or has the power of preserving");[9] Oxford English Dictionary (defining "preservative" as "[t]ending to preserve or capable of preserving").[10]

25. **Defendant exploits consumer demand for preservative-free food.** Defendant's misrepresentation seeks to capitalize on consumers' preference for products with no preservatives. Indeed, "[f]oods bearing 'free-from' claims are increasingly relevant to Americans, as they perceive the products as closely tied to health … 84 percent of American free-from consumers buy free-from foods because they are seeking out more natural or less

---

[8] *See, e.g.*, NAT'L INSTITUTES OF HEALTH, *Vitamin E*, https://ods.od.nih.gov/factsheets/VitaminE-HealthProfessional ("Supplements of vitamin E typically provide only alpha-tocopherol, ... Many claims have been made about vitamin E's potential to promote health and prevent and treat disease.").

[9] *Preservative*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/preservative.

[10] *Preservative*, American Heritage Dictionary, https://ahdictionary.com/word/search.html?q=preservative.

processed foods. In fact, 43 percent of consumers agree that free-from foods are healthier than foods without a 'free-from' claim, while another three in five believe the fewer ingredients a product has, the healthier it is (59 percent). Among the top claims free-from consumers deem most important are trans-fat-free (78 percent) and preservative-free (71 percent)."[11]

26.　　According to another study, when consumers were asked to choose a product that was the closest to their understanding of what "natural" means on product labels, on balance, they chose products with "No Preservatives" labels.[12]

27.　　**Defendant exploits consumer demand for food free from artificial additives.** "Consumers express[] concerns about food additives, with 63.7% linking these concerns to human health. This perception influences their purchasing decisions as they prefer products labelled as natural and free of artificial ingredients, indicating a high demand for clean label products."[13]

28.　　Moreover, "[a]ccording to a survey by Label Insight, 73% of consumers are willing to pay more for products that are free from artificial additives. This indicates a strong demand for clean label products and a willingness to prioritize health and wellness when making

---

[11] *84% of Americans buy "free-from" foods because they believe them to be more natural or less processed*, MINTEL (Sept. 3, 2015), https://www.mintel.com/press-%20centre/food-and-drink/84-of-americans-buy-free-from-foods-because-they-believe-them-to-be-more-natural-or-less-processed.

[12] Sajida Rahman et al., *Assessing consumers' understanding of the term "Natural" on food labeling*, 85 JOURNAL OF FOOD SCIENCE, 1891-1896 (2020), abstract available at https://ift.onlinelibrary.wiley.com/doi/10.1111/1750-3841.15128 ("'Organic' (31%), 'Made with real grains' (17%), and '**No preservatives**' (15%) were the top three chosen labels.") (emphasis added).

[13] Marius-Mihai Ciobanu et al., *The Impact of Artificial and Natural Additives in Meat Products on Neurocognitive Food Perception: A Narrative Review*, 13 FOODS (Dec. 2024), at 8, available at https://pmc.ncbi.nlm.nih.gov/articles/PMC11640593/pdf/foods-13-03908.pdf (internal citation omitted).

purchasing decisions. As consumers become more educated about the potential risks of synthetic preservatives, the demand for natural alternatives is likely to grow even further."[14]

29. **Accordingly, Defendant's misrepresentations are material to reasonable consumers.** Reasonable consumers would attach importance to a representation that a product has "No Artificial Preservatives" because research demonstrates that a majority of consumers place importance on "preservative-free" and/or "artificial-additive-free" claims.

30. The global sale of healthy food products is estimated to be $4 trillion dollars and is forecasted to reach $7 trillion by 2025.[15] Thus, consumers are willing to pay a premium for healthy, preservative-free food items, as they hoped for in purchasing the Products.

31. Defendant's misleading and deceptive practices proximately caused harm to Plaintiff and the proposed class members who suffered an injury in fact and lost money or property as a result of Defendant's deceptive conduct.

## CLASS ACTION ALLEGATIONS

32. Plaintiff seeks to represent a class defined as all persons in the United States who, during the applicable statute of limitations period, purchased Defendant's Products (the "Class").

33. Plaintiff seeks to represent a subclass defined as all Class members who reside in New York who purchased the Products (the "New York Subclass") (collectively with the Class, the "Classes").

---

[14] ESSFEED.COM, *Consumer Perception of Natural Preservatives and the Demand for Clean Label Products*, (Mar. 19, 2025), https://essfeed.com/consumer-perception-of-natural-preservatives-and-the-demand-for-clean-label-products-consumer-perception-of-natural-preservatives-and-the-demand-for-clean-label-products/.

[15] Global Wellness Institute, *The Global Wellness Economy Stands at $4.4 Trillion Amidst the Disruptions of COVID-19; Is Forecast to Reach $7 Trillion by 2025*, https://www.hospitalitynet.org/news/4108643.html.

11

34. Members of the Classes are so numerous that their individual joinder herein is impracticable. On information and belief, members of the Class number in the hundreds of thousands. The precise number of Class members and their identities are unknown to Plaintiff at this time but may be determined through discovery. Class members may be notified of the pendency of this action by mail and/or publication through the distribution records of Defendant and third-party retailers and vendors.

35. Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to: the true nature and presence of preservatives in the Products; whether the marketing, advertising, packaging, labeling, and other promotional materials for the Products are deceptive; whether Plaintiff and the members of the Classes have suffered damages as a result of Defendant's actions and the amount thereof; and whether Plaintiff and the members of the Classes are entitled to attorneys' fees and costs.

36. The claims of the named Plaintiff are typical of the claims of the Class in that the named Plaintiff was exposed to Defendant's false and misleading marketing, purchased Defendant's Products, and suffered a loss as a result of those purchases.

37. Plaintiff is an adequate representative of the Classes because his interests do not conflict with the interests of the Class members he seeks to represent, he has retained competent counsel experienced in prosecuting class actions, and he intends to prosecute this action vigorously. The interests of Class members will be fairly and adequately protected by Plaintiff and his counsel.

38. The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of Class members. Each individual Class member may lack the

resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability. Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case. Individualized litigation also presents a potential for inconsistent or contradictory judgments. In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability. Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

## CAUSES OF ACTION

### COUNT I
### Violation of the New York General Business Law ("GBL") § 349
### (On behalf of the New York Subclass)

39. Plaintiff incorporates by reference and re-alleges herein all paragraphs alleged above.

40. Plaintiff brings this cause of action on behalf of herself and members of the New York Subclass against Defendant.

41. Plaintiff and New York Subclass members are "persons" within the meaning of the GBL § 349(h).

42. Defendant is a "person, firm, corporation or association or agent or employee thereof" within the meaning of GBL § 349(b).

43. Under GBL § 349, "[d]eceptive acts or practices in the conduct of any business, trade or commerce are unlawful."

44. Defendant made false and misleading statements by marketing the Products as

containing "No Artificial Preservatives" when in fact they contain the preservatives tocopherols.

45. In doing so, Defendant engaged in deceptive acts or practices in violation of GBL § 349.

46. Defendant's deceptive acts or practices were materially misleading. Defendant's conduct was likely to and did deceive reasonable consumers, including Plaintiff, about the quality of its Products, as discussed throughout.

47. Plaintiff and New York Subclass members were unaware of, and lacked a reasonable means of discovering, the material facts that Defendant withheld.

48. Defendant's actions set forth above occurred in the conduct of trade or commerce.

49. The foregoing deceptive acts and practices were directed at consumers.

50. Defendant's misleading conduct concerns widely purchased consumer products and affects the public interest. Defendant's conduct includes unfair and misleading acts or practices that have the capacity to deceive consumers and are harmful to the public at large. Defendant's conduct is misleading in a material way because it fundamentally misrepresents the production and quality of the Products.

51. Plaintiff and New York Subclass members suffered ascertainable loss as a direct and proximate result of Defendant's GBL violations in that (a) they would not have purchased the Products had they known the truth, and (b) they overpaid for the Products on account of the "No Artificial Preservatives" misrepresentation, as described herein.

52. On behalf of themselves and other members of the New York Subclass, Plaintiff seeks to enjoin Defendant's unlawful acts and practices described herein, to recover their actual damages or $50, whichever is greater, reasonable attorney's fees and costs, and any other just and proper relief available under GBL § 349.

## COUNT II
### Violation of the New York General Business Law § 350
### (On behalf of the New York Subclass)

53. Plaintiff incorporates by reference and re-alleges herein all paragraphs alleged above.

54. Plaintiff brings this claim individually and on behalf of the members of the New York Subclass against Defendant.

55. GBL § 350 provides that "[f]alse advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state is hereby declared unlawful."

56. Defendant's labeling and advertisement of the Products was false and misleading in a material way. Specifically, Defendant advertised the Products as containing "No Artificial Preservatives" when in fact they contain the artificial preservative tocopherols.

57. Plaintiff and reasonable consumers understand Defendant's misrepresentations to mean that the Products do not contain artificial preservatives.

58. This misrepresentation was consumer-oriented and was likely to mislead a reasonable consumer acting reasonably under the circumstances.

59. This misrepresentation has resulted in consumer injury or harm to the public interest.

60. As a result of this misrepresentation, Plaintiff and New York Subclass members have suffered economic injury because (a) they would not have purchased the Product had they known the truth, and (b) they overpaid for the Products on account of the "No Artificial Preservatives" misrepresentation, as described herein.

61. By reason of the foregoing and as a result of Defendant's conduct, Plaintiff and New York Subclass members seek to enjoin the unlawful acts and practices described herein, to

recover their actual damages or five hundred dollars, whichever is greater, three times actual damages, reasonable attorneys' fees and costs, and any other just and proper relief available under GBL § 350.

### COUNT III
### Breach of Express Warranty
### (On behalf of the Class and the New York Subclass)

62. Plaintiff incorporates by reference and re-alleges herein all paragraphs alleged above.

63. Plaintiff brings this claim individually and on behalf of the members of the Class against Defendant.

64. Defendant, as the producer, marketer, distributor, and/or seller, expressly warranted that the Products contain "No Artificial Preservatives."

65. Defendant's representations and warranties were part of the description of the goods and the bargain upon which the Products were offered for sale and purchased by Plaintiff and members of the Classes.

66. In fact, the Products do not conform to Defendant's representations and warranties because the Products contain tocopherols, a well-known artificial preservative. By falsely representing the Products in this way, Defendant breached its express warranty.

67. As a direct and proximate cause of Defendant's breach of express warranty, Plaintiff and members of the Classes have been injured and harmed in an amount to be proven at trial because they would not have purchased the Products, or would have paid substantially less for them, had they known they contained an artificial preservative.

68. Prior to filing the initial complaint in this action, Defendant was served via certified mail with a pre-suit notice letter on behalf of Plaintiff that complied in all respects with

U.C.C. §§ 2-313 and 2-607.

## COUNT IV
### Unjust Enrichment
### (In the Alternative)

69. Plaintiff incorporates by reference and re-alleges herein all paragraphs alleged above.

70. Plaintiff brings this claim individually and on behalf of members of the Class against Defendant.

71. Plaintiff and Class members conferred benefits on Defendant by paying money to Defendant for the purchase of the Products.

72. Defendant has knowledge of such benefits.

73. Defendant has been unjustly enriched in retaining the revenues derived from Plaintiff's and Class members' purchase of the Products. Retention of those moneys under these circumstances is unjust and inequitable because Defendant misrepresented that the Products contain "No Artificial Preservatives" when in fact they contain tocopherols, which are a known artificial preservative.

74. Because Defendant's retention of the non-gratuitous benefits conferred on it by Plaintiff and Class members is unjust and inequitable, Defendant must pay restitution to Plaintiff and the Class members as ordered by the Court.

## PRAYER FOR RELIEF

WHEREFORE Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

    (a)    For an order certifying the Class and New York Subclass under Rule 23 of the Federal Rules of Civil Procedure, naming Plaintiff as representative of the Class and New York Subclass, and naming Plaintiff's attorneys as Class Counsel to represent the Class and New York Subclass;

(b)      For an order finding in favor of Plaintiff and the Classes on all counts asserted herein;

(c)      For compensatory and statutory damages in amounts to be determined by the Court and/or jury;

(d)      For prejudgment interest on all amounts awarded;

(e)      For an order of restitution and all other forms of equitable monetary relief;

(f)      For an order enjoining Defendant from continuing the illegal practices detailed herein and compelling Defendant to undertake a corrective advertising campaign; and

(g)      For an order awarding reasonable attorneys' fees and expenses and costs of suit.

## DEMAND FOR TRIAL BY JURY

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of any and all issues in this action so triable as of right.

Dated: August 15, 2025            Respectfully submitted,

**BURSOR & FISHER, P.A.**

By:    */s/ Julian C. Diamond*
        Julian C. Diamond

Julian C. Diamond
1330 Avenue of the Americas, 32nd Floor
New York, New York 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
E-Mail: jdiamond@bursor.com

*Attorney for Plaintiff*